**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**

| | |
|---|---|
| INNOVERE MEDICAL INC.,<br><br>Plaintiff,<br><br>v.<br><br>SIEMENS HEALTHINEERS AG, and SIEMENS HEALTHCARE GMBH.<br><br>Defendants. | Case No. 2:25-CV-01147<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Innovere Medical Inc. ("Innovere" or "Plaintiff"), for its Complaint against Siemens Healthineers AG and Siemens Healthcare GmbH, ("Siemens" or "Defendants"), states and alleges as follows:

**PARTIES**

1. Plaintiff Innovere has its principal place of business at B113-3600 Steeles Avenue East, Markham, Ontario, Canada, L3R 9Z7.

2. Defendant Siemen Healthineers AG is a corporation organized and existing under the laws of Germany, with its principal place of business at Henkestrasse 127 Erlangen, 91052 Germany, with its registered office in Munich, Germany.

3. Defendant Siemens Healthcare GmbH is a corporation organized and existing under the laws of Germany, with its principal place of business at Siemensstr. 3, 91301 Forchheim, Germany.

**NATURE OF THE CASE**

4. Innovere brings this suit pursuant to U.S.C. § 1836, the Defend Trade Secrets Act ("DTSA"), and the Texas Uniform Trade Secrets Act ("TUTSA").

5. This case arises from Siemens' methodical, deliberate, coercive, and deceitful plan to financially inundate Innovere and take Innovere's intellectual property underlying the Innovision™ system.

6. Innovere owns proprietary, valuable, confidential and trade secret information in connection with a commercial medical imaging audio-visual system called Innovision™ ("Innovision").

7. Traditional MRIs scan patients using machines that are noisy, where patients are confined in narrow bores, often leading to patients feeling claustrophobic, anxious, uncomfortable and restless.

8. Innovision is an innovation that increases patient comfort by creating in patients an impression of a larger space, allowing patients, especially children, to feel more relaxed, less anxious, and able to remain still, reducing the need for rescans, making MRI scanning more

efficient for both patients and operators.

9. Innovision caught the attention of Siemens, who after several demonstrations by Innovere, requested sole distribution rights to Innovision and launched a deceitful, coercive plan to improperly obtain Innovere's trade secrets.

10. In 2019, Innovere and Siemens entered into a Master Purchase agreement ("MPA") (Exhibit A), under which Innovere would manufacture and deliver Innovision to Siemens and integrate Innovision into Siemens' MRI machines.

11. Under the MPA, Siemens agreed to purchase all Innovision systems produced at a guaranteed amount for multiple years. Siemens included deceptive financial conditions in the MPA which appeared to provide Innovere startup capital but would eventually hobble Innovere allowing Siemens to take Innovere's intellectual property.

12. In 2022, Siemens and Innovere next entered into a Contract Manufacturing Agreement ("CMA") (Exhibit B), under which Siemens took on production of Innovision, providing Siemens with greater access to Innovere's proprietary technologies and suppliers.

13. Later in 2022, Siemens attempted to acquire additional rights to Innovere's intellectual property related to Innovision by insisting on a "Term Sheet" (Exhibit C), leading to a new agreement in which Siemens would take greater access to Innovere's intellectual property, including product know-how and documentation, manufacturing information, test specifications and protocols, engineering design files, and software source code. Through the earlier, deceptive financing Siemens deployed against Innovere, which Siemens now demanded Innovere repay, Innovere had little choice but to agree to the Term Sheet, while a final agreement was negotiated, or Siemens would commence collection proceedings leading to Innovere's insolvency.

14. Siemens leveraged its commercial relationship with Innovere – the MPA, CMA and financings – which was progressively manifest by Innovere's near-total financial reliance on Siemens, to obtain access to Innovere's intellectual property, including Innovere's trade secrets involved in the design, development, manufacture, testing, and fielding of Innovision ("Trade Secrets").

15. As a result of Siemens' access, Siemens used Innovere's confidential and Trade Secret information, including on information and belief, to try to replicate Innovision and incorporate Innovere's technology into its MRI machines.

16. The Term Sheet is invalid, and Innovere is currently seeking to have the invalidity of the Term Sheet confirmed in an ongoing ICC Arbitration between Innovere and Siemens with its seat in Zurich, Switzerland.

17. Siemens' actions violate the express terms of the MPA and CMA and constitute misappropriation of Innovere's confidential Trade Secret information.

18. Even if the Term Sheet was valid, Siemens' actions violate the express terms of the Term Sheet and constitute misappropriation of Innovere's confidential Trade Secret information, because on information and belief, Siemens continues to use Innovere's confidential Trade Secret information beyond the scope authorized in the Term Sheet.

19. Innovere has tried since December 2023 to persuade Siemens to address its misappropriation and redress the substantial harm to Innovere that Siemens has caused, but Siemens has ignored Innovere's concerns.

**JURISDICTION AND VENUE**

20. This is an action for trade secret misappropriation based on Defendant's violation of 18 U.S.C. § 1836 (DTSA) and the Texas Uniform Trade Secrets Act ("TUTSA"). This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and over Defendant's related state law trade secret misappropriation claim under 28 U.S.C. § 1367 (supplemental jurisdiction).

21. This Court has personal jurisdiction over Siemens. Siemens has sufficient minimum contacts with the United States as a result of intentional contacts. Siemens has a continuous, systematic presence within the United States. Siemens has purposefully availed itself of the US forum knowing that it could reasonably anticipate being haled into court.

22. Siemens develops, manufactures, markets, imports, offers to sell, and sells products and services throughout the United States. In the US, Siemens knowingly markets, imports, offers

to sell, and sells and services products embodying the Trade Secrets. In these forums, Siemens regularly distributes its products, including products embodying the Trade Secrets, and provides channels for sales and service.

23. Numerous events giving rise to this action occurred in the United States.

24. Innovere and Siemens first met and established a business relationship at a trade show in Chicago, Illinois in 2017.

25. The parties' dealings under related contracts involved meetings, marketing, and operations in the US.

26. Innovere and Siemens jointly installed systems embodying the Trade Secrets at locations throughout the United States.

27. Siemens has obtained Innovision components through suppliers in the US, including Innovere's suppliers.

28. Siemens has targeted, and on information and belief, continues to target its marketing, advertising, and promotion of MRI infotainment systems at the US market.

29. Siemens has sold, and on information and belief, continues to sell MRI infotainment systems embodying Innovere's Trade Secret information in the US.

30. Siemens has pursued, and on information and belief, continues to pursue business, development, and manufacturing relationships in the US using Innovere's Trade Secret information.

31. Siemens has solicited, and on information and belief, continues to solicit, engineering service providers and customers in the US using Innovere's Trade Secret information.

32. On information and belief, Siemens continues to service Innovision systems installed with its customers in the US.

33. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 at least because Siemens is a foreign corporation and is subject to personal jurisdiction in the United States. Venue is also proper in this Court because certain of the acts complained of here occurred in the United States. Additionally, Siemens—directly or through intermediaries (including distributors, retailers,

and others), subsidiaries, alter egos, and/or agents—ships, distributes, offers for sale, and/or sells its products and services in the United States. Siemens has purposefully and voluntarily placed one or more of its products into the stream of commerce, including products embodying Innovere's Trade Secret information, with the awareness and/or intent that they will be purchased by consumers in the United States. Siemens knowingly and purposefully ships products into, and within, the United States. These products have been, and continue to be, purchased by consumers and businesses in the United States. Venue is therefore proper in the Eastern District of Texas, Marshall Division.

## FACTUAL BACKGROUND

### A. Innovere's Origin

34. Between 2004 and 2015, Innovere's founders Kevan Anderson and Garry Liu were graduate students and later post-doctoral fellows in the department of Medical Biophysics at the University of Toronto where they became experienced in the application of physics and electronics in MRI machines.

35. MRIs use magnets and radio frequency waves to scan patients, using computers to create images of the parts of the body scanned. The radio frequency emitted from MRIs often interfere with electronic devices near the MRI and particularly within its bore, and nearby electronic devices routinely interfere with the electronics used to operate MRIs. MRIs are enclosed in rooms with built-in Faraday cages, conductive envelopes which block electromagnetic fields from interfering with the MRI machine, stopping most radio frequencies used by wireless devices and making it difficult to transmit communication signals into and out of the MRI room.

36. In 2009, Mr. Anderson and Mr. Liu set out to develop a wireless electronic keyboard to control the MRI that could function inside the MRI room without degrading the image quality of ongoing scans. The keyboard idea ultimately failed. However, through their research, Mr. Anderson and Mr. Liu discovered that the mesh in the Faraday cage had patterned perforations which allowed certain radio frequencies to pass through. This understanding led to the design of a different device, a wireless headset that allowed communication between the MRI room and

outside, while not incidentally degrading the image quality.

37. In 2011, having sold and installed many headset systems in Canada, the U.S. and EU, Mr. Anderson and Mr. Liu founded Innovere and incorporated Innovere in Ontario, Canada.

**B. The Development of Innovision**

38. Innovere discovered the market need for a system operable within the MRI's bore to distract patients and increase their comfort during MRI scans without degrading the MRI's image quality. Through interviewing MRI scan patients, technicians and physicians, it became apparent that many patients experienced discomfort and anxiety, caused both by the noise and the small, typically 60 or 70 cm diameter MRI bore. This discomfort and anxiety often led to patients, especially children, being unable to lie still during scans which resulted in unacceptable imaging results and the need for rescans. For example, scanning failure rates can be as high as 50% in children ages between 2 to 5. *See* https://www.verywellhealth.com/virtual-reality-mri-scan-5198030. To address this, many patients (especially children) require anesthesia prior to receiving an MRI scan.

39. The need for sedation and rescans costs the medical imaging industries millions of dollars each year.

40. Innovere's founders focused their efforts on improving patient comfort during scans, including relieving patient anxiety and claustrophobia, resulting in fewer rescans and higher MRI efficiency.

41. In 2017, Innovere developed a functional prototype of Innovision, an audio-visual system which operated wirelessly inside an MRI bore without interfering with scans. Innovision comprises multiple novel components and techniques that, when combined, form the revolutionary audio-visual system. For example, Innovision includes a system that supports wireless communication between devices residing within, and external to a Faraday cage without appreciable attenuation and while continuing to eliminate outside interference with the scanner, preserving image quality. Innovision also provides for delivering images to a patient where those images are projected to the patient while preserving the projected field size during table motion

using a display system that is secured to the MRI's table and remain fixed relative to the table and the patient. Innovision further includes a communication headrest in contact with noise-isolating earplugs worn by the subject such that vibrations generated by vibration actuators are transferred through the earplug, via acoustic conduction, to enable the patient to hear audio content while the earplugs provide passive noise protection.

42. While other MRI infotainment systems exist, they do not provide the patient with immersive audio and visual experiences comparable to Innovision.

43. For example, other infotainment systems project images from outside the MRI bore onto a mirror or screen positioned within the bore which distorts and changes size and/or perspective of the displayed image as the MRI table moves in and out of the bore, reminding patients that they are moving into the narrow bore of an MRI machine. In contrast, Innovision is installed over the patient on the MRI table, before entering the bore, and then travels with the patient into the bore, providing a consistent visual and audio experience.

44. Some other infotainment systems display images as virtual reality within wearable headsets that are uncomfortable to wear for extended periods of time, especially when worn with other audio or noise-cancelling headsets, combining to remind patients that they are in a confined space.

45. In contrast, Innovision wirelessly projects to the patient while preserving the projected field size during table motion. This causes an illusion in which the patient perceives that they are residing in a region that is larger than the true region in which they reside, potentially reducing feelings of claustrophobia and reducing overall patient anxiety. Also, Patients' heads rest on a communication headrest that provides audio via acoustic conduction to enable the patient to hear audio content while earplugs provide passive noise protection. The headrest is comprised of material that has cushioning properties, providing patient comfort.

46. During the development of Innovision, the founders obtained multiple patents and other intellectual property to protect their innovations.

**C. Confidential and Trade Secret Information Found Within Innovision**

47. Innovision's confidential and Trade Secret information is the result of years of development and substantial investment. This confidential and Trade Secret information includes, but is not limited to, technical, manufacturing, and implementation details and know-how underlying the Innovision system and components that operate within the MRI's bore without interfering with the MRI's electronics or imaging.

48. Innovere has always protected its confidential and Trade Secret information related to Innovision because of Innovision's unique features and the time and investment in their development. For example, from the first meeting after introduction to Siemens, Innovere required an NDA before initial engagement. Innovere also required strict confidentiality provisions in the MPA and continuing in the CMA. [redacted].

49. Innovere's employment agreements also include confidentiality of information and ownership of proprietary property ("CIOPP") agreements and additional agreements confirming that employees did not have any interest in Innovere's Intellectual Property.

50. Innovere itself also imposed practices to protect its Trade Secrets. For example, Innovere sequestered Innovere's staff from Siemens' staff while performing repairs or rework of Innovision while in Siemens's facilities in Germany. Innovere also instructed staff not to disclose proprietary information on the Innovation system when interacting with non-Innovere employees, including customers and suppliers of services and parts.

51. Maintaining the confidentiality of Innovere's technical, manufacturing, and implementation details, know-how and show-how for the Innovision system was critical to Innovere, as Innovision is its primary product, and if other companies, such as Siemens, could freely copy and use Innovere's Trade Secrets without restriction, Innovere would have no business

and cease to exist.

### D. Siemens' Discovery and Systematic Misappropriation and Acquisition of Innovere's Intellectual Property

52. In November 2017, Innovere's founders attended the Radiological Society of North America conference in Chicago, Illinois ("RSNA"). Their goal was to showcase Innovision intending to find economic partners—original equipment manufacturers—to distribute Innovision and other customers for direct sales.

53. Innovere's plan worked. Linda Brown, a retired Siemens executive, introduced Innovere's founders to Walter Märzendorfer, then Head of Siemens' Magnetic Resonance department and before, Siemens Head of Technology & Innovation. Siemens executives, including Märzendorfer quickly introduced the founders to Martin Kraft and Donald Hardie. At that meeting, held the very next day, Innovere's founders required Kraft and Hardie to sign a confidentiality agreement before providing any information, and as authorized by Siemens, they did. At the meeting, the founders shared a PowerPoint presentation, including very limited confidential information about Innovision. Impressed with the Innovision presentation, the Siemens executives invited Innovere's founders to Germany to demonstrate an Innovision prototype and the underlying technologies.

54. In February 2018, Innovere's founders visited Siemens at their corporate headquarters in Germany where they were introduced to the then Managing Director of Magnetic Resonance Imaging at Siemens Healthineers, Christoph Zindel, and other senior executives. Innovere's founders demonstrated Innovision, inviting several Siemens executives to experience Innovision in action. The founders responded to questions and discussed Innovision's ability to impact the MRI market. Siemens' engineering, sales, and marketing teams, while very impressed with the demonstration, expressed [redacted].

55. After the demonstration, Siemens offered Innovere an exclusive global distribution partnership for Innovision, the MPA. Under the MPA, [redacted]

[redacted]. While Innovere maintained ownership of its patented technologies and confidential Trade Secrets, the MPA provided Siemens broad access and visibility into Innovere's protected and confidential intellectual property used in Innovision. For example, [redacted].

56. [redacted].

57. Notwithstanding these terms, Innovere, which had no current revenue source, was excited at the prospect of doing business with Siemens, one of the largest MRI manufacturers in the world. Innovere's founders were hopeful of reaching a business agreement with Siemens.

58. The MPA negotiations spanned close to 9 months before final signature in February 2019. During the protracted MPA negotiations, due to the exclusivity agreement with Siemens, Innovere operated with no revenue and insufficient contractual progress on the MPA to support a capital raise or commercial loan. Siemens proposed financial assistance in the form of a [redacted].

59. Throughout the parties' engagement, Siemens repeatedly sought to participate as a co-developer of Innovision and any refinements, seeking access to, and ownership interest in Innovere's proprietary technologies. Innovere consistently refused to allow Siemens that participation.

60. For example, Siemens inserted their research and development team into the

manufacturing and engineering process, seeking to learn about Innovision's operation and design and proposing to Innovere that Siemens should have co-developer status for the changes Siemens required, which Innovere rejected.

61. Siemens also added significant engineering expenses to Innovere prior to first delivery. Shortly after executing the MPA, Siemens demanded a series of significant specification changes, all at Innovere's expense, including substantial reduction in the size of the Innovision display, [redacted].

62. The complex, expensive, and time-consuming redesigns imposed significant financial hardship on Innovere because it delayed the start of production, delivery, and receipt of revenue.

63. Innovere bore the expense of this redesign [redacted].

64. Siemens continuously sought to understand Innovision beyond the publicly available and Innovere-supplied information and sought unfettered access to Innovere's intellectual property.

65. Siemens' specification changes to Innovision added 18 months of re-engineering, causing the launch to be delayed while Siemens continued to try to access Innovere's intellectual property.

66. The launch and first Innovision installations began in March 2021, coinciding with the COVID-19 pandemic and resultant supply chain disruptions.

67. These external factors, along with Siemens' specification changes, exacerbated delays, slowed and reduced deliveries and installations of Innovision and resulted in revenues well short of Siemens' financial guarantees and Innovere's revenue projections.

68. Siemens was aware of the significant shortfall in Innovere's revenue and the impact it had on Innovere's finances. Siemens did not pay the financial guarantees.

69. Siemens also rejected numerous Innovision deliveries because of purported quality issues, including [redacted] on surfaces hidden from view and alleged [redacted] (subsequently disproved), again resulting in significant delivery delays and causing substantial repair expense, revenue delay with significant financial impact on Innovere.

70. The alleged quality defects gave Siemens increased visibility into Innovere's suppliers and its contract manufacturing partner and processes. For example, as a result of Siemens alleging a color mismatch (later confirmed to be within acceptable standard deviation), Innovere was required to dismantle dozens of systems to return the housing part involved from Germany to the supplier in [redacted], all requiring consequential Innovere expenses, resulting in significantly delayed deliveries and revenue, while allowing Siemens direct access to a significant supplier.

71. Purporting to offer assistance, in July 2021, Siemens dispatched Bernd Stoeckel, one of its manufacturing experts, to Toronto to evaluate purported quality and performance issues at Innovere's contract manufacturer, [redacted].

72. Stoeckel spent more than two weeks monitoring the [redacted] work and reported that Innovere and [redacted] were fully capable of meeting Siemens' production and quality standards. However, Stoeckel's visit provided Siemens additional access and visibility into Innovere's proprietary intellectual property, both its know-how and show-how.

73. Despite Stoeckel's report approving Innovere and its supplier, Arthur Kaindl, then Executive Vice President of Magnetic Resonance at Siemens, and currently Head of Varian, a Siemens Healthineers company in Palo Alto, California, insisted that Innovere relocate manufacturing operations to Erlangen, Germany pursuant to a proposed new Contract Manufacturing Agreement, the CMA, or else he would discontinue the Innovision project. Kaindl offered no room for discussion or negotiation.

74. Kaindl characterized the demand as an effort to "help" Innovere with

manufacturing, but the change provided Siemens even greater access to Innovere's proprietary technologies leaving Innovere less protection against Siemens' eventual misappropriation. Siemens' demand to move Innovere's manufacturing to Germany would not improve manufacturing but instead would cause further delays and increased costs, mainly to be borne by Innovere.

75. Discussions, which increasingly took the form of Siemens' demands rather than negotiations, continued into 2022, when Kaindl insisted Innovere sign the CMA. Kaindl demanded Innovere provide its technical and manufacturing know-how in advance, as a gesture of good faith, to allow Siemens to prepare for the manufacturing, and threatened to terminate the project if Innovere refused to comply.

76. During these discussions, [redacted]. Kaindl also insisted Innovere sign the CMA or he would slow payment of its receivables, further impairing Innovere financially, which would lead to its insolvency and allowing Siemens to hire Innovere's employees.

77. With no reasonable alternative, and desperate to continue the project with Siemens, Innovere reluctantly agreed and executed the CMA in March 2022, providing Siemens control over Innovision's production and even greater access to Innovere's protected Trade Secrets, proprietary know-how, and patented technologies, including access to Innovere personnel.

78. The MPA and CMA did not provide Siemens unfettered access and use of Innovere's confidential information. [redacted].

79. [redacted]

[redacted].

80. [redacted].

81. In another claim to offer assistance with supply chain bottlenecks, Siemens proposed to take over sourcing parts for the Innovision system, which Innovere expected would result in Siemens having the ability to buy in larger lots at lower costs from its own network of suppliers.

82. In the following two years, Siemens only added two suppliers to its existing approved vendors list, not enough to help with the parts bottleneck that had carried over from the pandemic. The maneuver, however, provided Siemens with direct access to Innovere's suppliers.

83. Soon after the CMA was signed, Siemens' aggressive attempts to acquire Innovere's intellectual property continued with a proposed "Term Sheet" in later drafts of which Siemens would demand a license, for limited specified use, to all Innovere's remaining intellectual property, including product know-how documentation, engineering design files, and software source codes. The final draft Term Sheet purports to include a license to all Innovere's intellectual property on unconscionably non-commercial and crushing terms.

84. Siemens applied pressure on Innovere to sign the Term Sheet by threatening to collect what was owed [redacted].

85. Further, during the negotiation of the Term Sheet, Siemens withheld revenue owed to Innovere, with a peak balance of [redacted].

86. With Innovere's backs against the wall, Siemens provided the final version of the Term Sheet for signing. If Innovere did not sign the Term Sheet, Siemens threatened to issue

invoices and begin collection on [redacted]; however, if Innovere were to sign, those amounts would be netted against the value of the license in the Term Sheet. The Term Sheet also included a provisions which excused Siemens from honoring [redacted].

87. However, the Term Sheet and the provisions within it were meant to be temporary and required a subsequent formal agreement, as stated on the face of the Term Sheet. The formal agreement required by the Term Sheet was never executed.

88. The validity of the Term Sheet is being determined in an ongoing ICC arbitration with its seat in Zurich, Switzerland.

89. The Term Sheet highlights the deceptive, coercive and forceful tactics used by Siemens to commandeer Innovere's intellectual property and confidential information, including Trade Secrets. But, with no other choice but to face insolvency if Siemens were to demand collection of [redacted], Innovere had no alternative but to sign the Term Sheet.

90. In March 2023, Siemens went further by recruiting and hiring Innovere's first-hired employee, a senior electronics engineer intimately knowledgeable about all Innovere's protected Trade Secrets, proprietary know-how, and other confidential information.

91. In December 2023, Innovere hired Hawk Capital to attempt to restore a commercial relationship between Siemens and Innovere. After two meetings in Erlangen in January 2024, Siemens refused to consider any change. In March 2024, Innovere hired Hawk Capital to design and run a process, either to raise capital or to sell the company.

92. In April 2024, Siemens publicly recorded the Term Sheet at the United States Patent and Trademark Office (USPTO) for U.S. Patent No. 10,935,614. Siemens did not communicate with Innovere regarding recording the Term Sheet at the USPTO. Although the Term Sheet recorded at the USPTO was heavily redacted, it publicly communicates that Siemens obtained Innovere's know-how and Siemens plans to develop and manufacture infotainment systems using Innovere's know-how. Siemens also recorded the Term Sheet at the USPTO for U.S. Patent No. 10,578,689 and U.S. Patent Application No. 18/281,197, in June 2024 and December 2024,

respectively.

93. In May 2024, Robert Lawrie, Hawk's principal, met with Kaindl in Palo Alto, California to attempt to persuade him of an opportunity for Siemens to buy Innovere on immediately accretive terms and essentially for less than the immediately accruing tax benefit.

94. During the meeting, Kaindl took over the agenda, directing most of the conversation to inconsequential matters. Eventually, after about an hour and thirty minutes, Kaindl returned to the matter at hand and committed to send an email summarizing Lawrie's proposal to Siemens' senior executives, including Andreas Schneck and Peter Horn.

95. As the meeting ended, in response to a question from Lawrie, Kaindl did not deny that Siemens leveraged its position and power to push Innovere to insolvency in an attempt to improperly acquire and use Innovere's intellectual property.

96. On information and belief, Siemens continues to manufacture and install MRIs equipped with the Innovision system throughout the United States and the world.

97. On June 12, 2025, Innovere sent a letter notifying Siemens of their ongoing misappropriation. Innovere offered Siemens an opportunity to address their wrongdoing and the substantial harm they continue to cause Innovere. Siemens denied all wrongdoing and has not taken steps to address the concerns raised by Innovere.

**E. Siemens' Ties to the US and this District**

98. Siemens continues to have employees in the United States, including in this District. Siemens imports, sells, and offers to sell MRI systems, including infotainment systems, throughout the United States at various medical facilities. Siemens pursues its intellectual property rights in the United States and holds thousands of US patents.

99. Siemens regularly participates in trade shows and conferences throughout the United States. At these events, Siemens markets its medical products and services and develops business relationships. Innovere met Siemens at the 2017 RSNA conference in Chicago, Illinois, leading to the events giving rise to this action. In 2018, Siemens and Innovere jointly demonstrated Innovere's Innovision system at the RSNA conference in Chicago, Illinois. After 2018 Siemens

continued to market the Innovision system, without Innovere's participation, including at trade shows and conferences throughout the United States. On information and belief, Siemens continues to market and promote MRI infotainment systems embodying Innovere's Trade Secrets, including at trade shows and conferences throughout the US.

100. Since 2018, as part of the parties' dealings under relevant contracts, Siemens and Innovere conducted meetings, customer and product development, operations, and customer service in the United States. In its dealings with Innovere, Siemens has procured parts for Innovision systems from US-based suppliers and for Innovision systems installed in the United States. In 2022, Siemens and Innovere jointly installed Innovere's Innovision system at medical locations including in Washington, DC; Manchester, New Hampshire; and Grand Rapids, Michigan. Innovere employees worked with Siemens to install the system and trained Siemens employees on use of the system. Since roughly 2021, Siemens has installed dozens of MRI systems throughout the United States, including systems embodying Innovere's Trade Secrets. [redacted]

[redacted]

[redacted]

[redacted]

101. Siemens targets the United States for marketing, advertising, and sales for MRI infotainment systems.

102. Siemens markets and promotes its MRI systems, including infotainment, at trade shows and conferences throughout the US.

103. Siemens also maintains a website used for advertising, marketing, and promoting its MRI products and services to US-based customers.

104. Siemens' website has advertised Innovision for use in the United States and continues to advertise and promote infotainment systems for use in the United States.

105. Siemens also advertises, markets, and promotes MRI infotainment systems in trade publications disseminated and made available in the United States.

106. Siemens has also continued to develop MRI infotainment systems, using Trade Secrets obtained from Innovere, with US suppliers and partners.

107. In 2019, Canon Medical Systems U.S.A., Inc. ("Canon") acquired Quality Electrodynamics ("QED"), an Ohio-based company and a supplier to Siemens.

108. [redacted]

109. On information and belief, Siemens has pursued and continues to pursue a business relationship with QED to develop MRI infotainment technology. As part of that relationship, Siemens has offered QED access to Innovere's Trade Secret information.

**COUNT 1**
**(Misappropriation the Under Defend Trade Secrets Act)**

110. Paragraphs 1 through 109 are incorporated by reference herein

111. Under the Defend Trade Secrets Act ("DTSA"), Innovere owns Trade Secrets including technical, manufacturing, implementation details and know-how underlying the Innovision system as described above.

112. Innovere's Trade Secrets constitute trade secrets within the meaning of the DTSA because they derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use, and Innovere takes efforts that are reasonable under the circumstances to maintain their secrecy. For example, Innovere kept Trade Secrets involved in the design, development, manufacture, testing, and fielding of Innovision which directly contributed to its commercial value. Further, Innovere took protective measures by required Siemens sign an NDA before initial engagement, and its employment agreements included confidentiality of information and ownership of proprietary property ("CIOPP") agreements and agreements that employees did not have any interest in Innovere's Intellectual Property. Further, Innovere imposed practices such as sequestering Innovere's staff from Siemens' staff while performing repairs or rework of

Innovision while in Siemens's facilities in Germany and instructed staff not to disclose proprietary information on the Innovation system when interacting with non-Innovere employees, including customers and suppliers of services and parts.

113. The information within the technical, manufacturing, implementation details and know-how underlying Innovision, among other things, allows for the operation of wireless electronic components within an MRI's bore without interfering with the MRI's imaging and provides novel MRI infotainment systems and technologies that improve the comfort and efficacy of MRI treatment.

114. Innovere uses its Trade Secrets in connection with interstate commerce, having sold systems to Siemens for use as an appliance with Siemens' MRI machines across the United States.

115. Siemens is not authorized to use, publish, divulge, disclose, or make known in any manner the Trade Secrets or any part thereon in a manner inconsistent with the valid agreements between the parties.

116. On information and belief, Siemens has, without authorization, improperly used, published, divulged, disclosed or made known the Trade Secrets in whole or in part by, at a minimum, by continuing to develop, manufacture, support, and/or incorporate Innovision, or a substantially similar audio-visual system for use as an appliance with its MRI machines.

117. On information and belief, Siemens gained access to and misappropriated Innovere's Trade Secrets through a deliberate plan of coerced interactions and agreements.

118. On information and belief, Siemens gained access to and misappropriated Innovere's Trade Secrets by demanding Innovere surrender its manufacturing rights and move manufacturing of Innovision to Siemens' facilities in Germany.

119. On information and belief, Siemens gained access to and misappropriated Innovere's Trade Secrets by taking over Innovere's supplier relationships.

120. On information and belief, Siemens gained access to and misappropriated Innovere's Trade Secrets by recruiting and hiring key Innovere personnel.

121. In each of the foregoing ways (without limitation), Siemens has acted in violation

of the DTSA.

122. Innovere has been and will continue to be irreparably harmed by Siemens' misappropriation of its Trade Secrets.

**COUNT 2**
**(Misappropriation the Texas Uniform Secrets Act)**

123. Paragraphs 1 through 122 are incorporated by reference herein

124. Under the Texas Uniform Trade Secrets Act ("TUTSA"), Innovere owns Trade Secrets including technical, manufacturing, implementation details and know-how underlying the Innovision system as describes above.

125. Innovere's Trade Secrets constitute trade secrets within the meaning of the TUTSA because they derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use, and Innovere takes efforts that are reasonable under the circumstances to maintain their secrecy. For example, Innovere kept Trade Secrets involved in the design, development, manufacture, testing, and fielding of Innovision which directly contributed to its commercial value. Further, Innovere took protective measures by. Further, Innovere required Siemens sign an NDA before initial engagement, and its employment agreements included confidentiality of information and ownership of proprietary property ("CIOPP") agreements and agreements that employees did not have any interest in Innovere's Intellectual Property. Further, Innovere imposed practices such as sequestering Innovere's staff from Siemens' staff while performing repairs or rework of Innovision while in Siemens's facilities in Germany and instructed staff not to disclose proprietary information on the Innovation system when interacting with non-Innovere employees, including customers and suppliers of services and parts.

126. The information within the technical, manufacturing, implementation details and know-how underlying Innovision, among other things, allows for the operation of wireless electronic components within an MRI's bore without interfering with the MRI's imaging and provides novel MRI infotainment systems and technologies that improve the comfort and efficacy

of MRI treatment.

127. Innovere uses its Trade Secrets in connection with interstate commerce, having sold its system to Siemens for us as an appliance with Siemens' MRI machines located within the state of Texas.

128. Siemens is not authorized to use, publish, divulge, disclose, or make known in any manner the Trade Secrets or any part thereon in a manner inconsistent with the valid agreements between the parties.

129. On information and belief, Siemens has, without authorization, improperly used, published, divulged, disclosed or made known the Trade Secrets in whole or in part by, at a minimum, by continuing to develop, manufacture, support, and/or incorporate Innovision, or a substantially similar audio-visual system for use as an appliance with its MRI machines.

130. On information and belief, Siemens gained access to and misappropriated Innovere's Trade Secrets through a deliberate plan of coerced interactions and agreements.

131. On information and belief, Siemens gained access to and misappropriated Innovere's Trade Secrets by demanding Innovere surrender its manufacturing rights and move manufacturing of Innovision to Siemens' facilities in Germany.

132. On information and belief, Siemens gained access to and misappropriated Innovere's Trade Secrets by taking over Innovere's supplier relationships.

133. On information and belief, Siemens gained access to and misappropriated Innovere's Trade Secrets by recruiting and hiring key Innovere personnel.

134. In each of the foregoing ways (without limitation), Siemens has acted in violation of the TUTSA.

135. Innovere has been and will continue to be irreparably harmed by Siemens' misappropriation of its Trade Secrets.

## RESERVATION OF RIGHTS

136. Innovere hereby reserves the right to supplement with additional claims or defenses

as discovery proceeds in this matter.

## PRAYER FOR RELIEF

WHEREFORE, Innovere respectfully requests that this Court enter judgment in its favor and against Siemens as follows:

A. A judgment that Siemens is liable for misappropriating Innovere's Trade Secrets under the DTSA;

B. A judgment that Siemens is liable for misappropriating Innovere's Trade Secrets under the TUTSA.

C. Awarding all damages sufficient to fully compensate Innovere for past misappropriation, up until entry of the final judgment, by Siemens;

D. Awarding Innovere pre-judgment and post-judgment interest on its damages awarded, at the maximum allowable interest rate;

E. Awarding Innovere its reasonable costs and attorney's fees incurred in bringing this action; and

F. Awarding Innovere pre-judgment and post-judgment interest on its costs and reasonable fees, at the maximum allowable interest rate

## JURY DEMAND

Plaintiff respectfully requests a trial by jury for all issues so triable.

Dated: November 21, 2025

Respectfully submitted,

**BAKER BOTTS L.L.P.**

*/s/ Kurt M. Pankratz*

Kurt M. Pankratz (SBN 24013291)
Jacob McDonald (SBN 24116737)
BAKER BOTTS L.L.P.
2001 Ross Avenue
Suite 900
Dallas, TX 75201
Tel: (214) 953-6500

Fax: (214) 953-6503
Kurt.Pankratz@bakerbotts.com
Jacob.McDonald@bakerbotts.com

Jeremy J. Taylor (SBN 249075)
Bradley Shigezawa (SBN 336917)
BAKER BOTTS L.L.P.
101 California Street
Suite 3600
San Francisco, CA 94111
Tel: (415) 291-6200
Fax: (415) 291-6300
Jerem.Taylor@bakerbotts.com
Bradley.Shigezawa@bakerbotts.com

*Attorneys for Plaintiff Innovere Medical Inc.*

**CERTIFICATE OF MOTION TO SEAL**

I hereby certify that on November 21, 2025, a motion to seal the foregoing Complaint and Exhibits has been filed via CM/ECF.

*/s/ Kurt M. Pankratz* .
Kurt M. Pankratz